James R. MERCER, Petitioner,

v.

Victor T. HERBERT, Superintendent, Respondent.[1]

No. 96–CV–566A.

United States District Court, W.D. New York.

Feb. 27, 2001.

1. Although Walter R. Kelly, Superintendent, is named as the Respondent in the original Report and Recommendation filed May 6, 1999, on June 10, 1999, Judge Arcara ordered that the caption be amended to replace Victor T. Herbert, Superintendent as the Respondent.

Melissa Hancock Nickson, Buffalo, NY, for petitioner.

Eliot L. Spitzer, Attorney General, State of New York, Barbra A. Kavanaug, Assistant Attorney General in Charge, of Counsel, Buffalo, NY, for respondent.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio pursuant to 28 U.S.C. § 636(b)(1), on February 14, 1997. On May 6, 1999, Magistrate Judge Foschio issued a Report and Recommendation recommending that the petition be dismissed. On September 29, 1999, this Court re-referred the case to Magistrate Judge Foschio for further consideration in light of a recent Second Circuit decision decided on June 4, 1999, on a similar issue. In

addition, on April 25, 2000, petitioner filed a motion for reconsideration. On December 21, 2000, Magistrate Judge Foschio filed a Supplemental Report and Recommendation, recommending that the petition be dismissed.

Plaintiff filed objections to the Supplemental Report and Recommendation on January 4, 2001, and respondent filed a response thereto on February 23, 2001.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Supplemental Report and Recommendation to which objections have been made. Upon a *de novo* review of the Supplemental Report and Recommendation, and after reviewing the submissions, the Court adopts the proposed findings of the Supplemental Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Supplemental Report and Recommendation, the petition is dismissed. The Clerk of Court is directed to take all necessary steps to close this case.

IT IS SO ORDERED.

### SUPPLEMENTAL REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

Petitioner commenced this proceeding on August 27, 1996, requesting relief under 28 U.S.C. § 2254. On February 14, 1997, the matter was referred to the undersigned by the Hon. Richard J. Arcara for report and recommendation. The undersigned issued a Report and Recommendation on May 6, 1999 (Docket Item No. 11) recommending the petition be dismissed. On September 29, 1999, Judge Arcara re-referred the matter to the undersigned for further consideration in light of a recent Second Circuit decision, decided on June 4,

1999, on a similar issue.[2] The matter is also presently before the court on Petitioner's motion for reconsideration (Docket Item No. 29), filed April 25, 2000.

### *BACKGROUND*[3]

On August 12, 1986, Petitioner James R. Mercer, Jr. ("Mercer"), was charged in a 25 count indictment with three counts of Kidnaping in the Second Degree (N.Y.Penal Law § 135.20 (McKinney 1998)[4]), nine counts of Sodomy in the First Degree (N.Y.Penal Law § 130.50(1)), four counts of Sodomy in the Second Degree (N.Y.Penal Law § 130.45), two counts of Sodomy in the Third Degree (N.Y.Penal Law § 130.40(2)), two counts of Rape in the First Degree (N.Y.Penal Law § 130.35(1)), one count of Rape in the Second Degree (N.Y.Penal Law § 130.30), three counts of Sexual Abuse in the First Degree (N.Y.Penal Law § 130.65(1)), and one count of Assault in the Second Degree (N.Y.Penal Law § 120.05(2)), all in connection with his August 3, 1996 arrest for a series of sex crimes committed against three teenage girls in Niagara County between June 16 and June 28, 1986.

Betsy Glaser Hurley, Niagara County Assistant District Attorney, was assigned to prosecute the case. At his arraignment before the Niagara County Court, Hon. Charles J. Hannigan, on August 15, 1986, Mercer, represented by Victor A. Rippo, Esq., pleaded not guilty to all counts. On October 23, 1986, Rippo was terminated as Mercer's attorney and replaced with Rocco J. Bruno, Esq. Mercer later discharged Bruno and, on May 1, 1987, Niagara County Assistant Public Defender Matthew J. Murphy, III, was assigned to represent Mercer. Murphy advised the court at a pre-trial hearing on July 10, 1987, that Mercer intended to assert an insanity de-

---

**2.** The Second Circuit's written opinion on such case was published on February 1, 2000. *Gaines v. Kelly,* 202 F.3d 598 (2d Cir.2000).

**3.** The May 6, 1999 Report and Recommendation, which is supplemented by this Report

and Recommendation, contains a more complete background statement.

**4.** Unless otherwise indicated, references to N.Y.Penal Law are to McKinney 1998.

fense and, on July 16, 1987, Mercer filed an insanity defense notice.

A jury was selected on September 25, 1987 and Mercer's five-day jury trial commenced on September 28, 1987, and concluded on October 2, 1987 with guilty verdicts on all counts returned the same day. Mercer was sentenced by Judge Hannigan on November 2, 1987 to three sets of concurrent terms of 12½ to 25 years, representing the crimes against each victim, each term to run consecutive to the other sets for a total term of incarceration of 37½ to 75 years.

Following timely appeal to the Appellate Division, New York Supreme Court, Fourth Department, Mercer's convictions were unanimously affirmed on June 2, 1989. *People v. Mercer*, 151 A.D.2d 1004, 542 N.Y.S.2d 443 (1989). Leave to appeal to the New York Court of Appeals was denied on August 9, 1989. *People v. Mercer*, 74 N.Y.2d 815, 546 N.Y.S.2d 572, 545 N.E.2d 886 (1989).

On December 7, 1993, Mercer filed a post-conviction motion pursuant to N.Y.Crim.Proc.Law § 440.10 (McKinney 1994),[5] challenging the jury instructions constitutionality on the basis of the trial court's reasonable doubt definition. That motion was denied by Judge Hannigan on January 14, 1994, pursuant to N.Y.Crim. Proc.Law § 440.10(2)(c). Mercer's application to the Appellate Division, Fourth Department to review that denial was denied on June 8, 1994.

On January 9, 1996, Mercer petitioned for a writ of error *coram nobis* arguing that he was denied effective assistance of appellate counsel based on his appellate counsel's failure to challenge Judge Hannigan's jury instruction, defining the beyond a reasonable doubt standard, on direct appeal. The Appellate Division denied the petition on March 8, 1996. *People v. Mercer*, 225 A.D.2d 1114, 639 N.Y.S.2d 878 (1996). Leave to appeal to the Court of Appeals was denied on March 29, 1996. *People v. Mercer*, 87 N.Y.2d 1022, 644 N.Y.S.2d 155, 666 N.E.2d 1069 (1996).

On August 27, 1996, Mercer filed the instant petition seeking federal habeas relief for, *inter alia*, a denial of his Sixth Amendment right to effective assistance of trial and appellate counsel based on his trial attorney's failure to object to an alleged improper reasonable doubt charge, and his appellate attorney's failure to assert that ground on Mercer's direct appeal.

In response to Judge Arcara's order of October 29, 1996, Mercer, on November 14, 1996, explained that his petition should not be dismissed as untimely pursuant to 28 U.S.C. § 2244(d)(1), providing a one year period from the date a conviction becomes final in which to petition for habeas relief from a district court, as Mercer was required to exhaust state remedies, including his petition for *coram nobis* relief which was decided on March 8, 1996, before filing his petition. On December 18, 1996, Judge Arcara deemed Mercer's petition timely and Respondent was ordered to file his answer by February 10, 1997. Respondent's Answer, accompanied by the state court records, was filed on February 10, 1997; Mercer filed a Reply/Traverse on February 21, 1997.

On May 6, 1999, the undersigned issued a Report and Recommendation recommending that the petition be denied in its entirety. It was specifically recommended that Mercer's ineffective assistance of counsel claims, predicated on the allegation that Judge Hannigan's definition of the term "reasonable doubt" imposed a lesser burden of proof on the prosecution than constitutionally required, be denied because Mercer failed to demonstrate that his trial counsel's failure to object to the trial court's "reasonable doubt" instruction constituted legal representation that was so deficient as to prejudice his defense.

**5.** Unless otherwise noted, references to New York Criminal Procedure Law are to McKin-

ney 1994.

May 6, 1999 Report and Recommendation at 33–40. Accordingly, this court found there was no merit to Mercer's claim that his appellate counsel rendered ineffective assistance when he failed to appeal Mercer's conviction based on the trial counsel's failure to object to the reasonable doubt charge.

On May 17, 1999, Mercer moved for an order extending his time in which to file objections to that Report and Recommendation. On May 20, 1999, Judge Arcara granted the request and extended Mercer's deadline for filing objections to June 17, 1999. Mercer's objections to the Report and Recommendation were filed on June 15, 1999. By order dated June 17, 1999, Respondent was given until July 2, 1999 to file a response to Mercer's objections. On June 22, 1999, Mercer filed an amendment to his objections to the May 6, 1999 Report and Recommendation. On July 1, 1999, Respondent filed a Memorandum of Law in opposition to Mercer's objections (Docket Item No. 17) ("Respondent's Brief in Opposition to Objection").

While Mercer's objections to the Report and Recommendation were under consideration by Judge Arcara, the Second Circuit ruled, on June 4, 1999, that a similar definition of reasonable doubt contained in a jury charge given by Judge Hannigan in an unrelated case was constitutionally defective, and stated that "[a]n opinion further explaining .the panel's reasons shall follow forthwith." *Gaines v. Kelly,* 180 F.3d 371 (2d Cir.1999). Judge Arcara referred the matter back to the undersigned for further consideration in light of *Gaines* and directed that counsel be appointed to represent Mercer. Order filed September 20, 1999 (Docket Item No. 18). The Second Circuit's decision was published on February 1, 2000. *Gaines v. Kelly,* 202 F.3d 598 (2d Cir.2000).

On October 19, 1999, in accordance with Judge Arcara's direction, the court as-signed Melissa Hancock Nickson, Esq., as counsel to Mercer and conducted a hearing on October 27, 1999, to consider whether Respondent's counsel, the Niagara County District Attorney, should be disqualified based on the fact that Mr. Murphy, now District Attorney of Niagara County, served as Mercer's trial counsel. However, as the New York Attorney General has since been substituted as Respondent's counsel in this matter, the question of disqualification of the Niagara County District Attorney's Office is deemed moot and need not be further addressed.

On May 26, 2000, Respondent filed a Memorandum of Law (Docket Item No. 30) ("Respondent's Memorandum"), and the Affidavit of Barbra Kavanaugh, Assistant New York Attorney General in Charge. (Docket Item No. 31) ("Kavanaugh Affidavit"), in opposition. Mercer filed on June 9, 2000, a Reply Memorandum of Law (Docket Item No. 32) ("Mercer's Reply Memorandum"), and a Reply Affidavit of Melissa H. Nickson, Esq. (Docket Item No. 33) ("Nickson Reply Affidavit"). Oral argument was deemed unnecessary.

Based on the following, the petition should be DISMISSED.

### FACTS

On the evening of June 16, 1986, at approximately 9:00 P.M., 13 year-old Karla Hillman was grabbed from behind by Mercer as she walked from a bowling alley in Niagara Falls, New York, to a nearby convenient store to telephone her aunt for a ride home. (T. 114–16).[6] After a struggle, during which Hillman lost a gold cross and chain which she had worn around her neck, Mercer forced Hillman into his vehicle. (T. 117, 125, 139). Mercer forced Hillman to perform oral sex on him as he drove to a fielded area with Hillman locked in the vehicle. (T. 117–18). Mercer ·

---

6. "T." references are to the page number of the transcript of Mercer's state criminal trial

which commenced on October 28, 1987.

stopped the car, pulled down Hillman's pants and unsuccessfully attempted to have anal sex with her. (T. 118–19). Mercer asked Hillman if she had any Vaseline or lotion and she responded that she did not. (T. 119). Mercer then led Hillman out of the car to a path in the field where he again attempted to have anal sex with her, forced her to perform oral sex on him again, and performed oral sex on her before he tried, unsuccessfully to have sexual intercourse with her. (T. 119–20). Mercer instructed Hillman not to tell anyone about what he was doing to her as he did not want to go to jail and also told Hillman that they would have to "do this again sometime." (T. 122–24). Mercer asked for Hillman's telephone number which Hillman wrote on the top of a photograph she had with her. (T. 124). Mercer then drove Hillman to the house where she lived with her aunt and grandfather and dropped her off. (T. 125).

Hillman went inside the house and telephoned her aunt who was at a friend's house and asked her to come home. (T. 126). Hillman's aunt took her to the hospital where the Niagara Falls police were contacted and a rape protocol procedure was performed on Hillman to gather and preserve evidence of the crimes. (T. 126, 146). Hillman and her aunt next went to the Niagara Falls police station where they met with Detective Fink to whom Hillman reported she had given Mercer her telephone number. (T. 146). Believing that Mercer may attempt to contact Hillman, Fink arranged to have Hillman agree to meet Mercer if he should call. (T. 127, 146).

Mercer telephoned Hillman the next day, apologized for the previous night and told Hillman he wished to return her gold cross and chain to her. (T. 127, 140, 147). Hillman agreed to meet Mercer in front of a bakery at 8:30 that night and, as planned, went to the bakery while her aunt and Detective Fink observed from an unmarked police car. (T. 127, 147–48). Mercer never appeared, but some time later he called Hillman again, at which time Hillman told Mercer she could not meet him. (T. 128, 140, 148).

Just after midnight on June 22, 1986, 15 year-old Barbara Bethke, was approached by Mercer as she walked in front of a police station in Niagara Falls, New York. (T. 148–50). Holding a screwdriver to her stomach, Mercer forced Bethke into his vehicle and made Bethke undress. (T. 151–52, 154). Mercer drove the car while fondling Bethke and forcing her to perform oral sex on him. (T. 152, 154). Mercer placed "burn and antiseptic ointment" from a tube in the vehicle's glove compartment on his finger which he then stuck in Bethke's vagina. (T. 157). Mercer drove to a dark, isolated area while continuing to force Bethke to perform oral sex on him inside the car. (T. 152–53). However, when Bethke bit Mercer's penis as hard as she could, Mercer reacted by stabbing Bethke with the screwdriver in her leg, arm, breast and temple and pulling out handfuls of her hair. (T. 153). When Mercer told Bethke if she let go he would let her out of the car, Bethke released her bite and exited the car. (T. 154). Mercer also exited the car, ran around to the other side, pushed Bethke up against the car and punched her, knocking her to the ground. (T. 154, 159).

A police patrol car arrived and Mercer got back into his vehicle and sped away. (T. 159). Bethke ran over to the police who drove Bethke to the hospital where she was examined, her stab wounds were stitched and a rape protocol procedure was performed. (T. 159–60).

In the evening of July 28, 1986, 17 year-old Tammy Arbatosky, walked in the Summit Park Mall parking lot, located in the Town of Niagara, New York, to the spot where she usually waited for her brother with whom she often walked home from her job at the mall. (T. 173–74). Mercer pulled his vehicle up behind Arbatosky and asked for directions. (T. 177). Arbatosky gave Mercer the requested directions, turned around and Mercer jumped her

from behind. (T. 178). Mercer forced Arbatosky into the car, threatening to kill her with a screwdriver he wielded. (T. 178). Arbatosky's brother witnessed the incident from a distance. (T. 179).

With Arbatosky locked in the car, Mercer forced Arbatosky to perform oral sex on him as he drove to a dark deserted road. (T. 180–81). Mercer stopped the car, forced Arbatosky to remove her pants and underwear, performed oral sex on her, attempted to have sexual intercourse with her and bound her hands together with her socks. (T. 182–84). Mercer exited the car and removed some items from the trunk, including a tube from which he squeezed out a substance, which he placed on Arbatosky's body and inserted into her vagina. (T. 184–85). Mercer then had sexual intercourse with Arbatosky and, when he finished, told Arbatosky to get dressed and drove her home. (T. 185–86).

When Arbatosky arrived home, she reported the rape to her father who was speaking on the telephone with the Niagara County Sheriff's Department about Arbatosky's abduction which her brother had witnessed. (T. 188, 218). The police arrived and questioned Arbatosky whose parents then drove her to the hospital where she was examined and a rape protocol procedure was performed. (T. 219–20).

Niagara County Sheriff's Department Criminal Investigator Roger Andrews interviewed Arbatosky with regard to the incident and was able to locate a vehicle at the Cayuga Village Trailer Court which matched the Arbatosky's description of the perpetrator's vehicle. (T. 38, 46). Andrews and Niagara Falls Police Department Detective Alan Brooks, who had interviewed Hillman and Bethke following their attacks, assisted each other and followed the described vehicle on several occasions. (T. 47–51, 275–77). Certain items which the victims had described as being inside their attacker's vehicle, including a pair of fuzzy dice hanging from the rear view mirror, a decal with the name "Jimmy" attached to the lower left side of the driver's column, a radio protruding from the dashboard, a tan interior, a square hairbrush, menthol cigarettes, tapes, a tube of salve, a screwdriver, a leather wrist band, rings and earrings, were all observed inside the described vehicle while it was parked at the Cayuga Village Trailer Court. (T. 52, 277).

Based on that information, a search warrant was obtained authorizing the search of the vehicle, the trailer where Mercer lived, and Mercer's person. (T. 277). On August 3, 1986, Andrews and Brooks observed Mercer driving in the Town of Niagara and pulled him over. (T. 54, 278, 291). Andrews and Brooks asked Mercer to accompany them to the Niagara Falls Police Station for questioning with regard to several complaints filed against him, and Mercer complied. (T. 54–55, 278).

Mercer first denied any involvement in the crimes against the three women, insisting that Hillman had willingly accompanied him, that Bethke was a hitchhiker he had picked up in front of the Niagara Falls Police Station who willingly undressed herself, and admitted to picking up a female outside the Summit Park Mall on another night, but denied having forcible sex with her. (T. 56–57, 279–82). Mercer also stated that he had a drinking problem and that when he drank, he did "stupid things." (T. 294). Mercer was then arrested. (T. 58, 284).

Andrews, Brooks and Niagara Falls Police Officer Timothy Bailey executed the search warrant of Mercer's bedroom in the trailer he shared with his mother, and found several of the items listed in the warrant including two gold chains, one with a cross and the other with a locket with a blue face. (T. 63–64, 66, 284). (T. 66). The officers' search of Mercer's vehicle revealed a tube of antiseptic and burn ointment, a black hairbrush, an orange hairbrush with a broken handle, a screwdriver, a decal bearing the name "Jimmy" on the dashboard to the right of the steering column, a pair of green dice hanging

from the rear view mirror, four packs of menthol cigarettes and cassette tapes, a torn piece of a photograph, and several items of clothing belonging to the victims. (T. 66–68, 75–76, 80). A vacuum cleaner fitted with a new filter picked up several hair and fibers from the vehicle's interior which were considered as possibly relevant.[7] (T. 73).

Based on psychiatric examinations of Mercer and his mother, performed at Mercer's attorney's request, clinical psychiatrist Dr. Bruno C. Schutkeker opined that Mercer was psychotic and, therefore, not responsible for his actions against the three women. According to Dr. Schutkeker, Mercer was permanently brain damaged from years of alcohol and drug abuse as well as several head injuries. Dr. Schutkeker further opined that Mercer was "beyond help" and that even with intense therapy Mercer should be institutionalized for the rest of his life.

On October 10, 1986, Judge Hannigan granted a request made by Bruno to have Mercer examined at his own expense at Children's Hospital in Buffalo, New York to determine whether Mercer was fit, under New York law, to stand trial. Copies of the test results were to be provided to Dr. Schutkeker, defense counsel, and Niagara County District Attorney. On December 11, 1986 at a pretrial hearing before Judge Hannigan, Bruno informed the court that Mercer was contemplating whether to assert an insanity defense and would decide once records were received from Children's Hospital in Buffalo, New York. (December 11, 1986 Pretrial Hearing T. at 3).

At a court appearance before Judge Hannigan on April 29, 1987, Bruno, in connection with Mercer's insanity defense, requested additional psychological testing be performed on Mercer by Dr. Richard V. Primo, a clinical psychologist. (April 29, 1987 T. 2). Prosecutor Hurley did not object to that request and arrangements were made to transport Mercer under guard to Dr. Primo's office in Lewiston, New York for the requested testing. (April 29, 1987 T. 3). Bruno then requested permission to withdraw as Mercer's counsel based on a conflict of interest; the motion was granted and the Niagara County Public Defender was assigned as Mercer's counsel. (April 29, 1987 T. 5–6, 18). On May 1, 1987, Niagara County Assistant Public Defender Matthew J. Murphy, III, filed a notice of appearance on behalf Mercer as defense counsel and, having been notified of the prosecution's intention to offer into evidence certain statements of Mercer constituting confessions or admissions, moved for a hearing to determine the voluntariness of such statements. Oral argument on that motion was held before Judge Hannigan on May 15, 1987, following which Judge Hannigan reserved decision. On June 8, 1987, Judge Hannigan denied all requests except for a statement relating to the location of Hillman's cross and chain which was suppressed.

Based on his psychological examination of Mercer, on May 1, 1987, Dr. Primo diagnosed Mercer with continuous alcohol dependence and paranoid personality disorder, determined Mercer was of low intelligence, and opined that Mercer's nature was hostile, he demonstrated poor reality testing, had inadequate impulse control and required institutionalization.[8]

At Hurley's request, Mercer was evaluated by Dr. Brian S. Joseph, on July 20, 1987 at Dr. Joseph's office in Buffalo, New York.[9] Dr. Joseph reported that Mercer was previously incarcerated from 1983 un-

---

7. Harry Anger, a forensic chemist, testified at trial that two hair fibers recovered from Mercer's vehicle could have come from Bethke's head. (T. 363).

8. A copy of Dr. Primo's report regarding Mercer is contained in the state records.

9. A copy of Dr. Joseph's report pertaining to his examination of Mercer is contained in the state court records.

til April 1986 for "sex crimes" involving a seven year-old child. Otherwise, Mercer's criminal history was significant for numerous arrests for disorderly conduct, criminal mischief and alcohol-related DWI's. Dr. Joseph diagnosed Mercer as having an anti-social personality disorder and opined that Mercer was capable of both knowing and appreciating that the nature and consequences of his actions were wrong.

On July 20, 1987, Hurley requested permission to have Mercer examined by Dr. Michael Lynch, a psychiatrist at the Niagara County Jail were Mercer was being held. Judge Hannigan granted that request by order dated July 27, 1987. On August 26, 1987, Mercer was examined at the Niagara County Jail by Dr. Lynch who did not provide a diagnosis, but opined that Mercer was fit to stand trial under New York law.[10]

The five day jury trial as to all three incidents commenced on September 28, 1987 and ended on October 2, 1987. Among the items admitted into evidence at trial were various items and articles of clothing recovered from Mercer's vehicle and residence and which either belonged to the victims or which they identified as seeing in Mercer's vehicle. Twenty-six witnesses testified on behalf of the prosecution including the three victims and various family members, the Niagara Falls police officers and Niagara County deputy sheriffs who were involved in the investigations, nurses and other health care professionals who examined the victims at the hospital, a previous girlfriend of Mercer, two forensic laboratory specialists and two psychiatrists, Dr. Lynch and Dr. Joseph, who testified as expert witnesses with regard to Mercer's mental state. The defense presented as its sole witness another psychiatrist, Dr. Schutkeker, who testified as an expert witness in support of Mercer's insanity defense. Hillman, Bethke and Arbatosky each identified Mercer at trial as the perpetrator of the sex crimes committed against them. (T. 135–36 (Hill-

man); T. 158 (Bethke); and T. 193 (Arbatosky)).

With regard to the psychiatric witnesses, Dr. Lynch testified that prior to examining Mercer, he had reviewed psychologist reports concerning Mercer prepared by Dr. Primo in July 1983 and May 1987, by Dr. Schutkeker in July of 1987, and by Dr. Joseph in July 1987. (T. 456). Dr. Lynch also reviewed Mercer's psychiatric records from Children's Hospital. (T. 457). According to Dr. Lynch, his mental status examination of Mercer included inquiry as to Mercer's personal history, his education, work experience and criminal history. (T. 458). Dr. Lynch asked Mercer to share his thoughts on the episodes with the three victims and Dr. Lynch testified Mercer had no trouble recalling the three incidents and described them in detail. (T. 458–59). When Dr. Lynch asked whether Mercer understood that he might be arrested based on such actions, Mercer replied that he knew his actions were wrong, but that he did not care that such actions could lead to his arrest and incarceration. (T. 458–59).

Mercer admitted to Dr. Lynch having been previously arrested for driving while under the influence, although Dr. Lynch testified that nothing indicated that Mercer was under the influence of drugs or alcohol when he committed the crimes against the three girls. (T. 459–60). Dr. Lynch concluded that he found no mental disease or defect indicating Mercer lacked a substantial capacity to understand or appreciate either the nature and consequences of his conduct or that such conduct was wrong at the time he committed the crimes. (T. 461–62, 464). Dr. Lynch also disagreed with Dr. Schutkeker's opinion insofar as Dr. Schutkeker had opined that Mercer's cognitive ability was impaired such that Mercer was not responsible for his actions. (T. 463).

Dr. Joseph, who testified as an expert witness on behalf of the prosecution, had

10. A copy of Dr. Lynch's report regarding Mercer is contained in the state court record.

examined Mercer on July 20, 1987. (T. 482, 486). It was Dr. Joseph's opinion that Mercer was responsible at the time of his criminal actions and could differentiate between right and wrong. (T. 488). While acknowledging that Mercer had a difficult childhood, Dr. Joseph stated that Mercer was

> very able to be intimidating, to know what he was doing, certainly as far as the accounts were certainly concerned, they were graphic, and there was nothing that would suggest that there was something the matter with him … by all accounts, there is nothing to suggest that he didn't know what he was doing, or couldn't differentiate that these things were wrong.

(T. 488).

Dr. Joseph further explained that although he did not dispute that Mercer was troubled, to be troubled "does not necessarily translate into a mental illness and an inability to be responsible for one's actions." (T. 489). Moreover, Mercer stated to Dr. Joseph that he knew Hillman was not a willing participant and that he knew his actions toward her were wrong. (T. 489). Mercer also claimed he knew his actions against the other two victims were wrong and denied hearing voices. (T. 489).

With regard to Mercer's mental state, Dr. Joseph opined he did not agree with Dr. Schutkeker's finding that Mercer was psychotic and overtly paranoid. (T. 490–91). Rather, Dr. Joseph believed Mercer had an antisocial personality which was evidenced by such "unpleasant characteristics" as Mercer's violent thoughts, anger, hostile and impulsive nature, poor control and judgment, lack of conscience, indifference to the welfare and concerns of others, and that Mercer was hedonistic, wanton, cruel and self-centered. (T. 491–92). Dr. Joseph did not believe that such characteristics indicated that Mercer was mentally ill such that he did not know or appreciate that his actions against the three victims were wrong. (T. 491, 492). Dr. Joseph stated that Mercer did not appear delu-

sional or display any false beliefs which would be symptomatic of a major mental illness. (T. 492). Dr. Joseph further noted that Mercer was very focused when asked to recount his actions toward the victims and that if Mercer's mental status been significantly compromised by a mental illness, his recollection of such events would have been "clumsy." (T. 495).

Testifying as an expert witness of behalf of Mercer, Dr. Schutkeker explained that he interviewed Mercer's mother, Phyllis Mercer, before examining Mercer to gain insight into Mercer's background. (T. 380, 384). Dr. Schutkeker testified that Phyllis became pregnant with Mercer shortly after high school as a result of an affair with an older man and that she was married to Mercer's father for only three weeks when he left her. (T. 391). Mercer suffered seven severe head injuries as a child. (T. 390). At the age of seven, Mercer committed several acts of cruelty including pouring gasoline over cats and incinerating them, and decapitating another cat. (T. 390).

Dr. Schutkeker described Mercer, who was problematic in school and frequently expelled, as defiant, rebellious, troublesome, obstreperous and delinquent. (T. 394). Dr. Schutkeker stated that Mercer was at one time considered bright, although his intellectual capacity deteriorated as his mental illness progressed. (T. 395). Mercer's father reportedly suffered from a character disorder as well as a drinking problem. (T. 391). When Mercer was 16, he attempted to find his father who rejected the opportunity to establish ties with his son. (T. 392). According to Dr. Schutkeker, as a single mother, Phyllis was inadequate and tended to overindulge Mercer with material things out of guilt. (T. 392–93). Dr. Schutkeker attributed Mercer's hatred of females to an unhealthy relationship with his mother and lack of a father figure in his life, and explained that Mercer's attacks on other females reflected the anger and hostility Mercer felt toward his mother. (T. 393).

Upon Dr. Schutkeker's examination of Mercer on September 23, 1986, Mercer had been free of any drug or alcohol use for two months and such abstention rendered Mercer "calm, more quiet, more controlled, more in touch with reality." (T. 386). Dr. Schutkeker stated that Mercer cooperated with Dr. Schutkeker as best he could given his poor memory which Dr. Schutkeker attributed to Mercer's drug use. (T. 386).

Dr. Schutkeker opined that Mercer was competent to stand trial, but that Mercer did not possess the mental capacity to appreciate that the actions of which he was accused were wrong. (T. 386, 398). Dr. Schutkeker found Mercer bereft of judgment and reason and suicidal, and that his lack of insight into his alcohol problems was evident by his inability to learn from experience. (T. 398, 400). According to Dr. Schutkeker, Mercer felt personally persecuted by society, was unrealistic, and lacked awareness or concern. (T. 400–401). In Dr. Schutkeker's opinion, it was too late in Mercer's life for psychological rehabilitation as Mercer was completely psychotic and very dangerous, and there was no question that Mercer had committed the crimes for which he stood accused. (T. 402–403). In his testimony, Dr. Schutkeker emphasized that Mercer was not the type of individual who if adjudged not guilty by reason of insanity would be institutionalized for only a few years before being set free to commit such crimes again as no amount of therapy would ever permit Mercer to live anywhere but in an institution. (T. 404). Dr. Schutkeker also described Mercer as delusional as Mercer truly believed he was "a pretty great guy" and that the crimes he committed were the fault of society with Mercer as the true victim. (T. 405).

In response to a question, Dr. Schutkeker distinguished his findings from those of Dr. Joseph who opined that Mercer suffered from an antisocial personality, not a recognized mental disease or defect, explaining that a sociopathic personality is one step short of a psychosis or compete derangement, and that Mercer's tendency to vacillate from his psychotic state, at which time he would display merely an antisocial personality, was analogous to a remission of his mental disease as, in Dr. Schutkekers opinion, Mercer's psychosis was never alleviated. (T. 405, 406, 407–408). Dr. Schutkeker stated his belief that Mercer was somewhat better when examined in June or July of 1987, than in June or July 1986, as his intervening incarceration had rendered him unable to access drugs or alcohol for that year. (T. 407). Dr. Schutkeker also testified that Mercer admitted he understood that his actions against the three girls were wrong and that he showed some remorse. (T. 418).

During summation, Mr. Murphy, speaking on behalf of Mercer, made statements essentially conceding Mercer had committed the charged criminal acts, such that the only issue for the jury to decide was whether Mercer's mental capacity at the time he committed the crimes rendered him not responsible for such actions based on mental disease or defect.[11]

11. Relevant portions of Murphy's summation include the following:

In my mind, in my thinking about this, I think the word I've settled on is ugly. It's ugly, it's sad, it's unfortunate that these incidents happened, ladies and gentlemen, *but we're here to decide what was going on in this man's mind, during these unfortunate incidents,* and there's nothing we can do, nothing you can do can give those girls back those days, those hours.... Now, remember in jury selection we talked about the idea that you're not psychiatrists, you're not psychologists, you're just lay people, but you're called upon to make a decision of very extreme difficulty, something that all these medical men from Buffalo can't even agree on.... You listened to Karla Hillman.... You have spent a longer time listening to the details, the description of those events, than those doctors did. I thing that's one reason why it's such a fair, it's such a good system, that you are the people that decide these issues of mental capacity. Now ... *I ask you to consider, was there any significance to the fact that the only item that Mr. Mercer kept of personal property of these young was the gold cross*

Prior to charging the jury, Judge Hannigan explained that as to each of the 16 submitted counts,[12] the jury would be given the choice of finding Mercer guilty, not guilty, or not guilty by reason of insanity. (T. 514). In his instructions to the jury, Judge Hannigan defined the term "reasonable doubt." (T. 574–76). On October 2, 1987, the jury returned a verdict of guilty as to all 16 counts against Mercer. (T. 621–22).

*belonging to Karla Hillman, the gold cross that the police found in his trailer park, in his trailer home.* Even Karla Hillman in her description of these events used the word we would probably use, it was weird. *Weird that this young man, doing this violent activity with her,* would ask her what time do you have to be home, 9:45, quarter to 10, I forgot what the exact answer was, well, I'll make sure you're home within 15 or 20 minutes, you're only going to be a few minutes late. What we're talking about, what these doctors have been talking about, *what you're asked to decide is what was this man's mental capacity at the time of these events* .... Does that sound like the statement of a person that appreciates the nature and consequences of his action? *What else did he tell Karla Hillman? Well, maybe we can see each other, maybe we can go out on a date. We know that that happened.* Because in her innocence she gave him her telephone number, *and he called her up the next day, talked to her about whether she'd be willing to go out on a date with him. Does that—does that tell you something? About whether this man appreciated the enormity of the injury he had inflicted the previous night?* ... What does that tell you about this mental condition? ... Recall Barbara Bethke saying something to the effect he acted like he was out of control, that's how he was acting.... *Ask yourselves this question, would any sane person commit a crime in the parking lot of a police station?* .... [L]et's talk for a minute about the Tammy Arbatosky incident.... *[R]emember the question, are you a Catholic, what church do you go to. Does that sound like the questions, the comments of a man that was in–capable [sic] of controlling what his actions were, was in control of himself, knew what he was, about, is that the type of comment you would make to someone who you're going to assault like that?* .... [I]f you recall the Karla Hillman incident, *he took her all the way home, dropped her off and drove off at a normal pace. Does that*

At Mercer's sentencing on November 2, 1987, Judge Hannigan clarified that Mercer was on parole from a previous conviction for a sexual offense and sentenced Mercer as a second felony offender. (Sentencing T. 9–11).[13] Specifically, Mercer received concurrent sentences ranging from twelve and one half years to 25 years

*sound like the actions of a man that knew what he had just done, could appreciate that what he had done was wrong?* ... We're not talking about total impairment.... *We're talking about lacking the substantial capacity to know things* .... *We're talking about mental illness, accumulated mental illness from all the factors that these doctors talked about* .... We're talking about a number of factors which led, as Dr. Schutkeker told you, to *a profound mental illness*.... I'll let you decide, ladies and gentlemen, which of these doctors made the most sense when you're trying to figure out *what went wrong, why did these events occur.* *What do they tell me about this man's mental state on those three occasions in the summer of 1986* .... *Why did we have all this testimony about these young girls' underwear or pubic hair samples, why was that necessary? That wasn't an issue in this case,* ladies and gentleman, why do we have the testimony from these other family members about these young ladies crying? Certainly, certainly, we all could appreciate that it was a very sad, very painful experience, but who in this case has been trying to play on your sympathies, to try to get you to act on the basis of revenge, to punish, to use the sword. James Mercer and I aren't asking for your sympathies. All we're asking for is justice, in the complete sense of the term.... So that when you go in that jury deliberation room, you think about what is the appropriate disposition in this case. When we began, I only asked you to keep a fair and open mind. The trial is almost over, you've heard the witnesses, and *now I submit to you that there's only one conclusion which you as fair and just and honest people can make, that's the verdict of not guilty by reason of insanity.* Thank you.

(T. 522–34) (emphasis added).

12. Nine of the twenty-five counts charged were dismissed either on the merits or as redundant. (T. 514).

13. "Sentencing T." references are to the page number of the transcript from Mercer's November 2, 1987 sentencing proceeding.

for the crimes he was found to have committed against each of the three victims, with the sentences pertaining to Mercer's crimes against Arbatosky to run consecutive to the sentences pertaining to Mercer's crimes against Bethke which were to run consecutive to the sentences pertaining to Mercer's crimes against Hillman. (Sentencing T. 11–13). Accordingly, Mercer was sentenced to a total of 37½ years to 75 years.

On November 12, 1987, Mercer appealed his conviction to the Appellate Division, Fourth Department. The issues presented on appeal included whether the trial court's denial of Mercer's motion to sever his trial into three separate trials according to the charges he faced as to each of the three victims was error, whether Mercer was prejudiced by the length of time it took the trial court to rule on the severance motion, and whether the sentence imposed was excessive. As noted, Mercer's conviction was unanimously affirmed by the Appellate Division, Fourth Department on June 2, 1989. *People v. Mercer,* 151 A.D.2d 1004, 542 N.Y.S.2d 443 (1989). Leave to appeal to the Court of Appeals was denied on August 9, 1989. *People v. Mercer,* 74 N.Y.2d 815, 546 N.Y.S.2d 572, 545 N.E.2d 886 (1989).

On January 9, 1996, Mercer petitioned for *coram nobis* review arguing that he was denied effective assistance of appellate counsel. Mercer's argument was predicated on his appellate counsel's failure to raise certain issues on direct appeal including, *inter alia,* that the jury was improperly charged as to the definition of reasonable doubt. The Appellate Division denied the petition on March 8, 1996. *People v. Mercer,* 225 A.D.2d 1114, 639 N.Y.S.2d 878

(1996). Leave to appeal to the Court of Appeals was denied on March 29, 1996. *People v. Mercer,* 87 N.Y.2d 1022, 644 N.Y.S.2d 155, 666 N.E.2d 1069 (1996).

### DISCUSSION

Mercer asserts as grounds for habeas relief (1) denial of assistance of effective trial counsel, (2) denial of assistance of effective appellate counsel, (3) improper reasonable doubt instruction, (4) use of an allegedly unconstitutional verdict sheet, (5) denial of a *Sandoval/Ventimiglia* hearing[14] and (6) *Brady* violations. This Report and Recommendation supplements the May 6, 1999 Report and Recommendation only with regard to Mercer's claim that he was denied effective assistance of trial counsel based on counsel's failure to object to Judge Hannigan's definition of reasonable doubt in the jury instructions and his appellate counsel's failure to raise trial counsel's failure to so object as a basis for Mercer's direct appeal.

### A. *Need for an Evidentiary Hearing*

Pursuant to 28 U.S.C. § 2254, a district court makes an independent determination of a state prisoner's habeas petition as to whether the petitioner is in custody in violation of his rights under the Constitution or any laws or treaties of the United States. *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991). A state petitioner's federal habeas corpus petition may be dismissed if the petitioner has not exhausted available state remedies as to any of his federal claims, *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), although

**14.** A *Sandoval* hearing is a pretrial hearing where the trial judge makes a determination as to whether any prior convictions or proof of any prior commissions of specific uncharged crimes or bad acts may be admitted into evidence at a criminal trial. *People v. Sandoval,* 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974). In determining whether to admit evidence of other crimes, a balance must be struck between the probative worth of the evidence and the risk of unfair prejudice to the defendant. *Sandoval, supra,* at 416. A *Ventimiglia* hearing is a pretrial hearing where the trial judge determines the admissibility of evidence of uncharged criminal conduct. *People v. Ventimiglia,* 52 N.Y.2d 350, 438 N.Y.S.2d 261, 420 N.E.2d 59 (1981).

under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court is permitted to deny a state prisoner's habeas petition on the merits even though the prisoner has not exhausted available state remedies. 28 U.S.C. § 2254(b)(2).

In reviewing habeas petitions, federal courts do not function as appellate courts to review matters within the jurisdiction of the state, or to review rulings and decisions of state trial and appellate courts; rather, the court determines whether the proceedings in the state court amount to a violation of federal constitutional rights. *Coleman, supra.* Federal review of a state court conviction is limited to errors of federal constitutional magnitude which denied a criminal defendant the right to a fundamentally fair trial. *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

A state prisoner applying for a writ of habeas corpus under 28 U.S.C. § 2254 is not entitled to an evidentiary hearing by the federal court, but the granting of a hearing is within the discretion of the federal district court. *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 4–5, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (citing *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)); *Pagan v. Keane,* 984 F.2d 61, 63 (2d Cir.1993). Nevertheless, the state court's determination is presumed to be correct unless one of the specified conditions pursuant to 28 U.S.C. § 2254(e), formerly 28 U.S.C. § 2254(d), is found to exist, or unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Absent these factors, the burden rests on the petitioner to establish, by clear and convincing evidence, that the factual determination is erroneous. *Sumner, supra.*

The court is in possession of, and has reviewed, the complete state record, including the motion, hearings and trial transcripts as well as the briefs filed in connection with Mercer's direct appeal to the Appellate Division and his petition for writ of error *coram nobis.* Mercer has not requested that the court conduct an evidentiary hearing prior to resolving his claims for relief and has not challenged the record below as factually inadequate. Accordingly, the court in its discretion finds an evidentiary hearing unnecessary.

**B. Respondent's Procedural Default Contention**

As stated, this Report and Recommendation, which supplements the 1999 Report and Recommendation (Docket Item. No. 11), is limited to the dismissal of Mercer's ineffective assistance of counsel claims predicated on Judge Hannigan's "reasonable doubt" instruction to which Mercer's trial counsel did not object. In the earlier Report and Recommendation, the undersigned found that although the precise text of the instruction given at Mercer's trial was not judicially condoned, the instruction as a whole was not so flawed that it could reasonably be expected to lessen the prosecution's burden of proof below what was constitutionally required. May 6, 1999 Report and Recommendation (Docket Item No. 11) at 33–40. Following Judge Arcara's re-referral to the undersigned, based on the Second Circuit's decision in the *Gaines* case, and in response to Mercer's motion for reconsideration, Respondent contended, for the first time, that Mercer has procedurally defaulted on his claims regarding the reasonable doubt charge and, thus, is barred from seeking habeas relief on these claims. Kavanaugh Affidavit, ¶ 4; Respondent's Memorandum at 3–7.

**1. Challenge to Reasonable Doubt Instruction**

The record demonstrates that Mercer's trial counsel did not object to the definition of "reasonable doubt" included in the jury instructions; thus, the issue was not preserved for direct appeal as a matter of state law. *See* N.Y.Crim.Proc.Law

§ 470.05(2) (McKinney 1994) (defendant must object to jury instructions at trial in order to preserve issue for appellate review); *Taylor v. Harris,* 640 F.2d 1, 2 (2d Cir.) (*per curiam*) ("It is well settled in New York that failure to object to an erroneous charge constitutes a waiver precluding [federal habeas] review"), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981).[15] The parties, at the direction of the undersigned, submitted memoranda of law regarding whether Mercer is procedurally barred from challenging Judge Hannigan's instruction on reasonable doubt, a defense not raised by Respondent when the petition was first filed.

In *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), the Supreme Court held that when considering whether a claim presented for habeas relief has been exhausted, the district court may presume that

[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion "fairly appear[s] to rest primarily upon federal law," *Coleman* [*v. Thompson,* 501 U.S. 722, 740, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)], we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly where [ ] the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

*Ylst, supra,* at 803, 111 S.Ct. 2590.

Mercer first challenged Judge Hannigan's "reasonable doubt" instruction in his 1993 motion pursuant to N.Y.Crim.Proc.

Law § 440.10, which, in relevant part, provides

[a]t any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that: ... (h) The judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States.

N.Y.Crim.Proc.Law § 440.10(1)(h).

Specifically, in his § 440.10 motion, Mercer argued that the trial's judge's jury instruction on reasonable doubt did not become a basis for reversing his conviction until the Supreme Court decided *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), in November 1990, approximately 16 months after Mercer's direct appeal had been decided by the Appellate Division, and 14 months after his conviction became final upon denial of leave to appeal to the New York Court of Appeal which occurred on August 9, 1989. In *Cage,* the Supreme Court held that a jury instruction which equated "reasonable doubt" with "grave uncertainty" and "actual substantial uncertainty," and which further stated that a "moral certainty" was required to convict the defendant could have been interpreted by the jury as permitting a finding of guilt based on a lesser degree of proof than the beyond a reasonable doubt standard required by the Fourteenth Amendment Due Process Clause. *Cage, supra,* at 41. In *Cage,* the defendant was convicted of murder and sentenced to death on the basis that he shot a victim twice during an armed robbery. The shooting was witnessed with the first shot paralyzing the victim, but Cage argued the second shot he fired into the victim's head killing him was not intended by testifying the gun "just went off again." *Louisiana v. Cage,* 554 So.2d 39, 41 (La. 1989).

---

**15.** As noted, the only issues Mercer argued on direct appeal included that: (1) the denial of Mercer's severance motion was reversible error; (2) the trial court unjustly prejudiced Mercer's defense by waiting too long to rule on the severance motion and (3) the sentence imposed by the court was excessive.

Judge Hannigan denied Mercer's § 440.10 motion on January 14, 1994 [16] on the basis that it was inadequate as a matter of law under N.Y.Crim.Proc.Law § 440.10(2)(C), which, in relevant part, provides

> [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate state review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him.

N.Y.Crim.Proc.Law § 440.10(2)(C).

Accordingly, Judge Hannigan did not reach the merits of Mercer's challenge, based on *Cage*, to the reasonable doubt instruction but, rather, held Mercer had procedurally defaulted on the claim. Further, as the Appellate Division provided no reason for its June 9, 1994 decision upholding Judge Hannigan's denial of Mercer's § 440 motion, it is presumed that the appellate court affirmed based on the same procedural default. *Ylst, supra*, at 803, 111 S.Ct. 2590 ("where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits."). Accordingly, Mercer procedurally defaulted on his claim that the reasonable doubt instruction violated his federal due process rights.

■ Where a petitioner has procedurally defaulted on a claim, a federal habeas court is barred from reviewing the claim unless the petitioner shows both "cause" for the procedural default and "actual prejudice" flowing from the claimed error. *Reed v. Ross*, 468 U.S. 1, 11, 104 S.Ct.

2901, 82 L.Ed.2d 1 (1984) (citing *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), and *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). Absent a showing of cause and prejudice for the default, Mercer is barred from raising his direct challenge to the reasonable doubt on federal habeas review. *Murray v. Carrier*, 477 U.S. 478, 490–91, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

For purposes of testing the availability of federal habeas jurisdiction, "[c]ause" is established by showing "some objective factor external to the defense [which] impeded counsel's efforts to comply with the State's procedural rule." *Murray, supra*, at 488, 106 S.Ct. 2639. "These factors normally include: interference by government officials which made compliance with the state procedural rule impracticable; situations in which the factual and legal basis for the claim was not reasonably available to counsel at the time of default; or constitutionally ineffective assistance of counsel." *Washington v. Ross*, 1996 WL 172983 at *5 (E.D.N.Y.1996). "Prejudice" is established by showing that the claimed error worked to [the petitioners'] actual and substantial disadvantage. *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). A fundamental miscarriage of justice is established by showing that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent" of the crime for which he has been convicted. *Murray, supra*, at 496, 106 S.Ct. 2639.

■ Under the circumstances of the instant case, Mercer has demonstrated cause and prejudice such that the court has jurisdiction to entertain his claim for federal habeas relief that the reasonable doubt instruction was unconstitutional. Specifically, cause is established by the novelty of the issue of whether the reasonable doubt

---

**16.** A copy of Judge Hannigan's January 14, 1994 Decision and Order issued with regard to Mercer's § 440 motion is attached as Exhibit B to Respondent's Brief in Opposition to Objection (Docket Item No. 17).

instruction given at Mercer's trial impermissibly lessened the prosecution's burden of proof. *Reed, supra,* at 17–20, 104 S.Ct. 2901 (holding fact that a constitutional claim is so novel that it is not reasonable for counsel to raise it until after the Supreme Court articulates that such claim is a basis for federal habeas relief constitutes cause for failure to raise that claim in accordance with applicable state procedures). Further, the previously unrecognized constitutional principle articulated by the Supreme Court may apply retroactively provided it represents a "clear break with the past," which can occur in three ways. *Id.* at 17, 104 S.Ct. 2901. First, a Supreme Court decision may "explicitly overrule one of [its] precedents." *Id.* (citing *United States v. Johnson,* 457 U.S. 537, 551, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982)). "Second, a decision may 'overtur[n] a longstanding and widespread practice to which this [Supreme] Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved.' " *Id.* (quoting *Johnson, supra*). Third, "a decision may 'disapprov[e] a practice this [Supreme] Court has sanctioned in prior cases.' " *Id.*

The instant case falls into the first category inasmuch as the practice of defining "reasonable doubt" as a "moral certainty" was approved by the Court prior to deciding *Cage* in 1990. The Court has explained that the practice of defining "reasonable doubt" as "moral certainty" commenced with "a charge given by Chief Justice Shaw of the Massachusetts Supreme Judicial Court more than a century ago." *Victor v. Nebraska,* 511 U.S. 1, 8, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). That definition was first approved by the Supreme Court in 1907, *Victor, supra,* at 9, 114 S.Ct. 1239 (citing *Perovich v. United States,* 205 U.S. 86, 92, 27 S.Ct. 456, 51 L.Ed. 722 (1907), and widely adopted by state courts, although it later met with criticism in various states. *Id.* at 9, 114

S.Ct. 1239 (citing) *People v. Brigham,* 25 Cal.3d 283, 157 Cal.Rptr. 905, 599 P.2d 100, 106–121 (1979)). Nevertheless, the jury instruction at issue in Cage represents a clear break from the past insofar as the Court criticized one form of jury instruction in which "reasonable doubt" was defined, in part, as "moral certainty," *Cage, supra,* at 41, and is retroactively applicable to that extent. *Reed, supra,* at 17, 104 S.Ct. 2901. The holding in *Cage* represents a degree of novelty sufficient to constitute cause. As such, Mercer has established cause to avoid otherwise procedurally defaulting on his claim challenging the reasonable doubt instruction.

■ Sufficient prejudice to establish federal habeas jurisdiction also exists. In particular, the Supreme Court has held that the Fifth Amendment requirement of proof beyond a reasonable doubt in criminal cases is so intertwined with the Sixth Amendment right to a jury verdict that a constitutionally deficient jury instruction cannot produce a guilty verdict comporting with due process but, rather, requires reversal of a conviction. *Sullivan v. Louisiana,* 508 U.S. 275, 277–80, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (holding a *Cage* violation could never be held harmless error and, thus, not amenable to harmless error review but, rather, required outright reversal). It follows that a claimed *Cage* violation satisfies the prejudice requirement for establishing federal habeas jurisdiction. *Cf. Restrepo v. Kelly,* 178 F.3d 634, 640–41 (2d Cir.1999) (holding in context of Sixth Amendment ineffective assistance of counsel based on asserted failure of counsel to file appeal established prejudice *per se* for purpose of establishing habeas review jurisdiction as, if proven, such failure constitutes denial of a fundamental constitutional right). As such, Mercer has satisfied both the cause and prejudice prongs necessary to avoid dismissal of this claim based on procedural default.[17]

---

**17.** However, finding that an alleged *Cage* violation satisfies the cause and prejudice requirement to avoid a procedural default defense, thus conferring habeas jurisdiction,

## 2. *Ineffective Trial Counsel Claim*

 Mercer asserts for the first time in his habeas petition that he was denied effective assistance of trial counsel based on Murphy's failure to object to the reasonable doubt instruction. Petition, ¶ 12(D). Claims for ineffective assistance of trial counsel are, however, generally raised on direct appeal or in a motion pursuant to N.Y.Crim.Proc.Law § 440.10. As this claim was not presented on his § 440.10 motion in 1993, it remains unexhausted. Nevertheless, as the court finds it is not a basis for federal habeas relief, the court will consider it on its merits. 28 U.S.C. § 2254(b)(2).

Further, as of the date of Mercer's trial, the Supreme Court had yet to find any reasonable doubt instruction defining such doubt as "moral certainty" unconstitutional until *Cage* in 1990. *Cage, supra,* at 41. Therefore, Mercer's claim that he was denied ineffective assistance of trial counsel based on Murphy's failure to object to the reasonable doubt charge, although unexhausted in the state courts, is not barred by procedural default. *Reed, supra,* at 17, 104 S.Ct. 2901 (competent trial counsel cannot reasonably be expected to anticipate a moral issue of constitutional law decided after the trial).

## 3. *Ineffective Appellate Counsel Claim*

After the Appellate Division denied his § 440 motion in 1994, Mercer, in January 1996, filed a petition for a writ of *error coram nobis* in which he denominated his challenge to the reasonable doubt jury instruction as a claim of denial of effective assistance of appellate counsel in violation of the Sixth Amendment, based on his appellate counsel's failure to raise as an issue on direct appeal Mercer's trial counsel's failure to object to the reasonable doubt instruction. Mercer thus attempts to place his due process claim before the state courts through the "back door."

does not necessarily mean such claim has

*Kimmelman v. Morrison,* 477 U.S. 365, 378, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

In *Bunkley v. Meachum,* 68 F.3d 1518 (2d Cir.1995), the court considered on federal habeas review an alleged improper jury charge asserted as an ineffective assistance of appellate counsel claim based on appellate counsel's failure to raise the issue on direct appeal to the state court. The court stated that in such situations, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Bunkley, supra,* at 1522 (quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)). Accordingly, the court must "examine the fairness and the reliability of the proceeding in terms of the proper application of federal law." *Bunkley, supra,* at 1522. However, the same standard—denial of a fair trial—is applicable to a claimed denial of constitutional right to due process whether asserted as denial of effective assistance of trial or appellate counsel. *Id.* at 1523.

 New York's *coram nobis* remedy permits a challenge to a criminal conviction where no other statutory remedy is available as in the case of an ineffective assistance of appellate counsel claim. "[A] common-law coram nobis proceeding brought in the proper appellate court is the only available and appropriate procedure and forum to review a claim of ineffective assistance of appellate counsel until such time as the Legislature enacts a particular and comprehensive remedy. The absence of a codified form of relief and the long-standing recognition of coram nobis flexibility help lead us to the conclusion that challenges to an intermediate appellate court determination, based upon a claim of ineffective assistance of appellate counsel, whether appointed or retained, should be initiated by writ of error coram nobis before that very court." *People v. Bachert,* 69 N.Y.2d 593, 516 N.Y.S.2d 623,

merit.

509 N.E.2d 318, 321–22 (1987). *See also Garcia v. Keane,* 973 F.Supp. 364, 369 (S.D.N.Y.1997); *People v. Vincent,* 50 N.Y.2d 901, 431 N.Y.S.2d 518, 409 N.E.2d 990, 990 (1980). For purposes of federal habeas review, a motion for *coram nobis* relief exhausts a claim for ineffective assistance of appellate counsel even though such motion is not appealable, and thus is never presented, to the New York Court of Appeals. *Garcia, supra,* at 370; *Meatley v. Artuz,* 886 F.Supp. 1009, 1013 (E.D.N.Y. 1995). Further, under New York law there is no time limit on an application for a writ of *error coram nobis. People v. Richetti,* 302 N.Y. 290, 97 N.E.2d 908, 912 (1951).

On March 8, 1996, the Appellate Division, Fourth Department denied Mercer's *coram nobis* petition without expressing any reason for the denial. *People v. Mercer,* 225 A.D.2d 1114, 639 N.Y.S.2d 878 (1996).[18] As Mercer claimed in his *coram nobis* petition that he was denied his Sixth Amendment right to effective assistance of appellate counsel, his petition was predicated on federal law and, thus, the court presumes that the denial of the petition was based on that federal law, rather than on a procedural default based on state law. *Ylst, supra,* at 803, 111 S.Ct. 2590. The Court of Appeals' denial on March 29, 1996, of leave to appeal from the Appellate Court's decision, *People v. Mercer,* 87 N.Y.2d 1022, 644 N.Y.S.2d 155, 666 N.E.2d 1069 (1996), also rendered without an opinion, must thus be presumed to be based on the merits of the federal law question, rather than on a procedural default. *Id.*

Given that his ineffective assistance of appellate counsel claim was presented in the motion, the merits of Mercer's direct challenge to the reasonable doubt instruction were reached by the state courts, as it was necessary to consider this question in order to reach the merits of his claim that the failure to raise as a ground for direct appeal that Mercer's trial counsel's failure to object to the reasonable doubt instruction constituted ineffective assistance of appellate counsel. *Bunkley, supra,* at 1522. Mercer therefore exhausted state remedies with regard to his claim for ineffective assistance of appellate counsel and the procedural default rule does not bar this court from reaching the merits of Mercer's petition.

## C. *Merits of Mercer's Petition*

### 1. *Overview*

Turning to the merits of Mercer's petition, the court finds it should be dismissed for three reasons. First, Mercer's challenge to the jury instruction on reasonable doubt, presented as a denial of his Sixth Amendment right to effective assistance of trial and appellate counsel, cannot be sustained under the prevailing law at the time of the challenged representation. Second, Mercer's attorney's conceded during summation that Mercer had committed the criminal acts with which he was charged, (T. 522–34), thereby effectively nullifying Mercer's defense that the victims had consented to his actions toward them, leaving Mercer's insanity defense the only question before the jury, an issue on which, under New York law, Mercer carried the burden of proof by a preponderance of the evidence, and thus rendering the reasonable doubt jury instruction, as presently challenged by Mercer, irrelevant to the validity of his guilty verdicts. Third, construing, for the sake of analysis, Mercer's claim as a direct challenge to the jury instructions and assuming, *arguendo,* the retroactive application of case law in which similar definitions of reasonable doubt in jury instructions have been found unconstitutional, the claim does not satisfy the standard for habeas relief under the Antiterrorism and Effective Death Penalty Act ("the AEDPA"), specifically, 28 U.S.C. § 2254(d)(1), rendering the holding in *Gaines, supra,* inapplicable to this case.

---

**18.** The text of the Appellate Division's denial states, in its entirety, "Motion for writ of error *coram nobis* denied." *People v. Mercer,* 225 A.D.2d 1114, 639 N.Y.S.2d 878, 878.

The court addresses each of these reasons in turn.

### 2. *Failure to Demonstrate Trial Counsel Error Renders Ineffective Assistance of Appellate Counsel Claim Based on Trial Counsel's Failure to Object Without Merit*

The validity of a habeas petitioner's ineffective assistance of counsel claim is demonstrated by satisfying both elements of the two-part test as stated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994). Specifically, a petitioner must demonstrate that "(1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense." *Bunkley v. Meachum*, 68 F.3d 1518, 1521 (2d Cir.1995) (citing *Strickland, supra*, at 688, 694, 104 S.Ct. 2052). The *Strickland* test also applies where ineffective assistance is claimed based on an action by the court. *See Tyson v. Keane*, 159 F.3d 732, 736 (2d Cir.1998) (denying habeas relief where petitioner claimed Sixth Amendment right to counsel violated by court's refusal to appoint an expert), *cert. denied*, 526 U.S. 1027, 119 S.Ct. 1270, 143 L.Ed.2d 365 (1999).

There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 100–101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). As there are "countless ways to provide effective assistance in any given case," consideration of an ineffective assistance of counsel claim requires viewing the reasonableness of the counsel's challenged conduct with respect to the facts of the case as of the time of the counsel's conduct. *Strickland*, at 689–90, 104 S.Ct. 2052.

Further, "the right to effective assistance of counsel is not confined to trial, but extends also to the first appeal as of right." *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). A claim for ineffective assistance of appellate counsel is evaluated upon the same standard as is a claim of ineffective assistance of trial counsel. *Mayo, supra*, at 533 (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912, 113 S.Ct. 2347, 124 L.Ed.2d 256 (1993)); *Abdurrahman v. Henderson*, 897 F.2d 71, 74 (2d Cir.1990). Appellate counsel's performance will not be found objectively unreasonable, however, merely because every nonfrivolous argument was not advanced. *Mayo, supra*, at 533. Instead, appellate counsel is expected to focus on key issues and "winnow[ ] out weaker arguments." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Appellate counsel's performance may be found constitutionally inadequate upon demonstration that significant and obvious issues were ignored while weaker arguments were pursued. *Mayo, supra*. The degree of prejudice required by *Strickland* will be met upon a showing by the petitioner that absent appellate counsel's deficient representation, there is a reasonable probability that the outcome of an appeal to the state's highest court would have been different. *Mayo, supra*, at 534 (citing *Claudio, supra*, at 803).

Many courts, including the Supreme Court, permit alleged state court violations, ordinarily required to be raised on direct appeal to the state courts to be preserved for federal habeas review, to be admitted for such review through the "back door" in the form of a claimed denial of effective assistance of appellate counsel. *Kimmelman, supra* (permitting Fourth Amendment issue to be evaluated on habeas review as a Sixth Amendment claim based on appellate counsel's failure to appeal trial court's denial of motion to suppress); *Holman v. Page*, 95 F.3d 481, 482–83 (7th Cir.1996) (same); *Bunkley v. Meachum*, 68 F.3d 1518, 1522 (2d Cir.1995)

(reviewing in the form of an ineffective assistance of appellate counsel claim asserted in habeas petition allegation that appellate counsel failed to raise on direct appeal to the state court that jury was improperly instructed on how to apply state law circumstantial evidence rule); *Durrive v. United States*, 4 F.3d 548, 550 (7th Cir.1993) (observing that in limited circumstances an alleged violation of Fed. R.Crim.P. 32 requiring defendant be provided with copy of presentence report may be subject to federal habeas review within an ineffective assistance of counsel claim). *See also Chestaro v. United States*, 17 F.Supp.2d 242, 244 (S.D.N.Y.1998) (denying habeas relief on the basis that the claim that defense counsel failed to challenge elements listed in indictment was not raised on direct appeal and could not subsequently be admitted through the "back door" clothed as an ineffective assistance of counsel claim failed to meet *Strickland* requirements because of the novelty of issue).

As stated, Mercer's habeas petition, does not directly challenge the reasonable doubt jury instruction given at his trial; rather, Mercer attacks the instruction as a predicate for alleged violations of his Sixth Amendment right to effective assistance of counsel. This distinction is controlling as, under well settled federal habeas law, to prevail on an ineffective assistance of counsel claim, Mercer must demonstrate that: "(1) 'counsel's representation fell below an objective standard of reasonableness,' and (2) 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *United States v. Aiello*, 900 F.2d 528, 532 (2d Cir.1990) (quoting *Strickland, supra*, at 694, 104 S.Ct. 2052).

▉▉ In the instant case, the "reasonable doubt" jury instruction at issue in this case had not, at the time of either Mer-

cer's trial, in 1987, or his direct appeal, in 1989, been held unconstitutional by either New York state or the federal courts. *See Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (citing *Cage, supra*, in support of statement that "[i]n only one case have we held that a definition of reasonable doubt violated the Due Process Clause."). However, whether an accused's trial counsel has provided effective assistance must be considered based upon the prevailing law at the time of the challenged representation. *See Strickland, supra*, at 690, 104 S.Ct. 2052 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); *Jameson v. Coughlin*, 22 F.3d 427, 429 (2d Cir.1994) (holding that counsel's appellate strategy was reasonable given relevant New York Supreme Court Appellate Division precedents at the time of the appeal as "a court must 'judge the reasonableness of the counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct,' " and quoting *Strickland, supra*, at 690, 104 S.Ct. 2052); *United States v. Javino*, 960 F.2d 1137, 1146 (2d Cir.1992) (holding no merit to ineffective assistance of counsel claim with regard to sentence imposed where record demonstrated defendant's sentence was within range prescribed by relevant sentencing guidelines).

Based on the law at the time of Mercer's trial, including prevailing state law, it was reasonable for Mercer's trial counsel to conclude that the definition of reasonable doubt contained in the jury charge at issue did not lessen the prosecution's burden of proof.[19] Specifically, to sustain a conviction under the prevailing law of the New York Supreme Court Appellate Division, Fourth Department, when Mercer was tried in the fall of 1987, proof beyond a reasonable doubt required that the prose-

---

**19.** Although Mercer denominated ineffective assistance of trial counsel as a separate basis for habeas relief, Petition, ¶ 12(d), a careful reading of the record demonstrates that he did not raise that claim in his § 440 motion and, thus has not exhausted it. Nevertheless, the court considers the effectiveness of Mercer's trial court assistance to the extent necessary to reach the merits of his ineffective assistance of appellate counsel claim.

cution prove "to a moral certainty," the exclusion of "every other reasonable hypothesis." *See People v. Rowell,* 163 A.D.2d 833, 558 N.Y.S.2d 367, 367–68 (1990); *lv. to appeal denied,* 76 N.Y.2d 896, 561 N.Y.S.2d 558, 562 N.E.2d 883 (1990) (Table); *People v. Colvin,* 97 A.D.2d 972, 468 N.Y.S.2d 773, 773 (1983); *People v. Gross,* 51 A.D.2d 191, 379 N.Y.S.2d 885, 889 (1976); *People v. Harris,* 47 A.D.2d 385, 366 N.Y.S.2d 697, 700 (1975). As Mercer asserts, it was not until 1990 when the Supreme Court decided *Cage, supra,* that Mercer realized that the definition of "reasonable doubt" submitted to the jury that convicted him may have been unconstitutional. Moreover, as discussed *infra,* because trial counsel manifestly intended, at the end of the trial, to defend Mercer based solely on an insanity defense, counsel was reasonably unconcerned about the reasonable doubt instruction as it had no relevance to such defense upon which Mercer as the defendant carried the burden. Indeed, as discussed, Discussion, *infra,* at 240–43, because trial counsel tactically chose to rely on a concession that Mercer had committed the crimes charged in order to sustain the insanity defense for Mercer, such indifference to the reasonable doubt charge as given by Judge Hannigan was completely understandable.

Because as of the date of Mercer's trial, the Appellate Division, Fourth Department continued to affirm definitions of "reasonable doubt" which referred to a "moral certainty," the court finds that Mercer's trial counsel's representation did not fall "below an objective standard of reasonableness." *United States v. Aiello, supra,* at 532. As such, there is no need to consider whether "but for counsel's ... errors, the result of the proceeding would have been different." *Id.* It follows that Mercer's appellate counsel did not err in failing to assert as a ground for direct appeal in 1987 Mercer's trial counsel's failure to object to the reasonable doubt jury charge. If trial counsel's conduct was not ineffective, *a fortiori,* neither can appellate counsel's conduct be ineffective. *See*

*Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994) (holding that when a claim of ineffective assistance of appellate counsel is based on failure to raise viable issues on direct appeal, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal and citing *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986)); *See United States v. Gallo–Lopez,* 931 F.Supp. 146, 150 (N.D.N.Y. 1996) (holding no ineffective assistance of appellate counsel claim for failure to raise as basis for appeal of conviction ineffective assistance of trial counsel where basis for the latter claim was inadequate).

Nevertheless, insofar as *Cage* is, for purposes of exercising habeas jurisdiction only, considered as retroactively applicable, *see* Discussion, *supra,* at 234–35, and given that Mercer was proceeding *pro se* when he filed his petition, and in accordance with the Supreme Court's instruction that allegations of *pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers, *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), the court also considers Mercer's ineffective assistance of counsel claims as a direct challenge to the reasonable doubt instruction on the basis that it lessened the prosecution's burden of proof below that required by the Fourteenth Amendment Due Process Clause. *See Maleng v. Cook,* 490 U.S. 488, 493, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (construing *pro se* habeas petition liberally in accordance with *Haines, supra* ). However, Mercer's petition fares no better under that analysis.

### 3. *The Challenged Reasonable Doubt Instruction was Irrelevant to the Jury's Determination of Mercer's Guilt*

■ The record demonstrates that Mercer's trial attorney, Murphy, conceded during his summation that Mercer had committed the crimes with which Mercer

was charged and asserted that Mercer should be found not criminally responsible for such crimes by reason of mental disease or defect. This is significant as, under New York law, it is only after the jury finds that the prosecution has met its burden of proving a defendant guilty beyond a reasonable doubt as to each element of the crime charged that a defendant who asserts an insanity defense is required to prove by a preponderance of the evidence that he should be found not guilty because he lacked criminal responsibility by reason of mental disease or defect. *People v. Kohl,* 72 N.Y.2d 191, 532 N.Y.S.2d 45, 527 N.E.2d 1182, 1183, 1185 (1988) (citing *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). Thus, by conceding Mercer had committed the charged crimes, Murphy negated the need for the jury to determine whether Mercer had committed the alleged criminal acts, rendering the reasonable doubt instruction irrelevant as "absent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel." *Reed, supra,* at 13, 104 S.Ct. 2901 (quoting *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

In particular, after recapitulating the testimony of the three victims, Murphy then told the jury:

> In my mind, in my thinking about this, I think the word I've settled on is ugly. *It's ugly, it's sad, it's unfortunate that these incidents happened,* ladies and gentlemen, but *we're here to decide what was going on in this* [Mercer] *man's mind, during these unfortunate incidents,* and there's nothing we can do, nothing you can do can give those girls back those days, those hours. What you're here to do, to decide, is what has been proven to you, as part of the evidence in this case. Now, remember in jury selection we talked about the idea that you're not psychiatrists, you're not psychologists, you're just lay people, *but you're called upon to make a decision of extreme difficulty, something that all*

these medical men from Buffalo can't even agree on.

(T. 522–24) (emphasis added).

Murphy discussed the evidence regarding Mercer's state of mind based on the victims' observations during the incidents. (T. 523–27). For example, Murphy reiterated that Karla Hillman described the fact that the only piece of the victims' personal property Mercer kept was her gold cross, given his "violent activity with her," as "weird" (T. 523–24) (emphasis added), and that Mercer asked Hillman for her telephone number because he intended to call her for a date. (T. 524). Again, Murphy reminded the jury that Barbara Bethke testified that Mercer "acted like he was out of control," and asked the jury to question "would any sane person *commit a crime in the parking lot of a police station?*" (T. 525) (emphasis added). Further, with regard to Tammy Arbatosky's testimony that Mercer had asked her what religion she was and what parish she belonged to, Murphy stated to the jury

> Does that sound like the questions, the comments of a man that was in—capable [*sic*] of controlling what his actions were, was in control of himself, knew what he was about, is that the type of comment you would make to someone *who you're going to assault like that?*

(T. 526–27) (emphasis added).

Murphy urged the jurors to consider in evaluating Mercer's mental culpability the psychiatrists' testimony as to Mercer's "background, his family background and cruelty to animals and things like that," (T. 528), and alluded to Dr. Schutkeker's testimony, that Mercer suffered from "a profound mental illness." (T. 529). In further summation, Murphy stated it was for the jury to decide, of the three psychiatrists' testimony, whose

> made the most sense when you're trying to figure out what went wrong, why did these events occur. What do they tell me about *this man's mental state on*

*those three occasions in the summer of 1996?*

(T. 529–30) (emphasis added).

Finally, Murphy stated

The trial is almost over, you've heard the witnesses, and now I submit to you that there's only one conclusion which you as fair and just and honest people can make, that's the verdict of not guilty by reason of insanity.

(T. 533–34).

Murphy thus informed the jury that the only issue before them was Mercer's mental culpability and negated any need for the juror's to consider whether the prosecution had proven, beyond a reasonable doubt, that Mercer had committed the charged offenses. Under New York law, the burden then shifted to Mercer to prove by a preponderance of the evidence his affirmative defense that he was not criminally responsible by reason of mental disease or defect. N.Y. Penal Law §§ 25.00(2) and 40.15 (McKinney 1997).[20]

The record also demonstrates that Judge Hannigan properly instructed the jury that they were to consider such testimony only with regard to his insanity de-

fense, (T. 378–39), as required under N.Y.Crim.Proc.Law § 60.55 (McKinney 1992). In his final instructions to the jury, Judge Hannigan instructed the jury that the insanity defense is an affirmative defense for which the burden of proof is on the defendant to prove by a preponderance of the evidence. (T. 507–98). Significantly, after charging the jury, Judge Hannigan asked if there were any exceptions or requests to the charge to which Murphy affirmatively responded there were none. (T. 615).

As Mercer, through his attorney's summation, conceded that he had committed the criminal acts with which he was charged, the only issue before the jury was whether a mental disease or defect had rendered Mercer not criminally responsible for such actions.[21] Based on this concession, there was no need for the jury to consider the prosecutor's evidence of the crimes charged under the reasonable doubt standard; the only burden of proof they were called upon to apply, as a result of Mercer's defensive strategy, was Mercer's burden to establish his insanity by a preponderance of the evidence,[22] a stan-

**20.** Unless otherwise indicated, references to N.Y. Penal Law are to McKinney 1997.

**21.** Mercer has not asserted any claim of ineffective assistance of counsel based on the manifest decision of his trial attorney to concede the underlying crimes were committed by Mercer and exclusively pinning his defense to his alleged legal insanity at the time of the crimes.

**22.** The evidence regarding Mercer's alleged insanity defense was, however, demonstrably weak. Specifically, Dr. Schutkeker, Dr. Lynch and Dr. Joseph all testified that Mercer knew his actions against the three victims were wrong. See T. 386–418: Dr. Schutkeker opining Mercer was competent to stand trial, but did not possess the mental capacity to appreciate that the actions of which he was accused were wrong, that Mercer was completely psychotic and very dangerous and there was no question that Mercer had committed the crimes for which he stood accused, yet also testifying, contradictorily, Mercer admitted he understood that his actions against the three girls were wrong; T. 458–64: Dr.

Lynch testifying Mercer had no trouble recalling the three incidents and described them in detail and when asked whether Mercer understood that he might be arrested based on such actions, Mercer replied that he knew his actions were wrong, but that he did not care that such actions could lead to his arrest and incarceration, concluding that he found no mental disease or defect indicating Mercer lacked a substantial capacity to understand or appreciate either the nature and consequences of his conduct or that such conduct was wrong at the time he committed the crimes, and also disagreeing with Dr. Schutkeker's opinion that Mercer's cognitive ability was impaired such that Mercer was not responsible for his actions; T. 482–95: Dr. Joseph opining that although Mercer was an extremely troubled individual, at the time of the crimes, he was capable of distinguishing between right and wrong, and further disagreeing with Dr. Schutkeker's opinion that Mercer was psychotic and overtly paranoid but, rather, believed Mercer had an antisocial personality and did not believe that such antisocial characteristics indicated that Mercer

dard Mercer does not challenge.[23]

The reasonable doubt charge challenged by Mercer in this proceeding, even if erroneous, was therefore irrelevant to the case. Accordingly, *Gaines*, which involved no insanity defense and in which the defendant contested his guilt, *Gaines v. Mercer*, No. 93–CV–549 (W.D.N.Y. filed July 10, 1996) (Report and Recommendation (Docket Item No. 12), at 5, adopted by *Gaines v. Mercer*, No. 93 CV–549 (W.D.N.Y. filed August 30, 1996) (Docket Item No. 14)), is materially distinguishable from the facts in the instant case and is therefore not controlling.

### 3. *Mercer's Due Process Claim Fails to Meet the Requirements of 28 U.S.C. § 2254(d)(1)*

Because Mercer's petition was filed August 26, 1996, it is subject to the AEDPA, effective April 24, 1996, *Smith v. McGinnis*, 208 F.3d 13, 15 (2d Cir.) (*per curiam*), *cert. denied*, —— U.S. ——, 121 S.Ct. 104, 148 L.Ed.2d 63 (2000). As relevant, the AEDPA provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not· be granted with respect to any claim that was adjudicated on the merits in State court proceedings, unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States

28 U.S.C. § 2254(d).

According to the Supreme Court, "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States,' refers only to cases decided by the Supreme Court, as opposed to other courts." *Williams v. Taylor*, 529 U.S. 362, 411–13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). The Court further observed that § 2254(d) "refers to holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.*

■ ·As of Mercer's trial in 1987, the Supreme Court had yet to hold any definition of "reasonable doubt" unconstitutional. *Victor, supra*, at 5, 114 S.Ct. 1239 (citing *Cage, supra*, at 40). · Nor has the Supreme Court held that *Cage* retroactively applies to convictions like Mercer's, which became final prior to the date of the *Cage* decision. *Williams v. Cain*, 229 F.3d 468, 473–74 (5th Cir.2000) (denying federal habeas relief under 28 U.S.C. § 2254(d)(1) where as .of date habeas petition challenging reasonable doubt instruction given in petitioner's state. criminal trial was filed, Supreme Court had yet to hold *Cage* applied retroactively, rendering petitioner unable to establish his conviction was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"). Further, in *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the Supreme Court

---

was mentally ill, and that if Mercer's mental status been significantly compromised by a mental illness, his recollection of such events would have been "clumsy." In fact, Mercer's own expert, Dr. Schutkeker, testified that Mercer had committed the crimes, and stated, "He did commit these crimes, there's no question about it." (T. 403) Because of Dr. Schutkeker's self-contradictory testimony regarding Mercer's capacity to know right from wrong when committing the crimes, the jury, by its verdict, undoubtedly rejected Schutkeker's opinion as not credible.

**23.** Such a challenge would likely be unsuccessful as the Supreme Court has upheld state statutes placing the burden of proving insanity on the defendant. *See Reed, supra*, at 18, 104 S.Ct. 2901 (citing *Leland v. Oregon*, 343 U.S. 790, 806, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (Frankfurter, J., dissenting)). In New York, the insanity defense was first legislated as an affirmative defense in 1984, thereby placing the burden of its proof, by a preponderance of the evidence, on the defendant. 1984 N.Y. Laws c. 668.

held that the erroneous admission of a codefendant's confession was harmless error in part because the jury was instructed that they must be "satisfied beyond a reasonable doubt" and "to a moral certainty" of the defendant's guilt before they could convict him. *Schneble, supra,* at 431–32, 92 S.Ct. 1056. Thus, whether the reasonable doubt instruction challenged by Mercer involved "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), must be determined based on the law as of 1987. Because the Supreme Court has not held *Cage* to be applicable to convictions which became final before its date of decision, it cannot be said that the affirmance of Mercer's conviction or the denial of his request for post-conviction relief was "contrary to or involved an unreasonable application of Federal law, as determined by the Supreme Court." Thus, Mercer's requested relief based on *Cage* is barred under 28 U.S.C. § 2254(d).

As of 1987, it was clearly established federal law that jury instructions must be viewed as a whole and in the context of the entire trial, rather than separately and in isolation. *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 421, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985) (citing *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975)); *Chalmers v. Mitchell,* 73 F.3d 1262, 1267 (2d Cir.1996). A court should separately examine specific instructions only if convinced that a portion of the charge misled the jury. *Id.* As explained by the Supreme Court, " '[o]ften isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial.' " *Park, supra,* at 674–75, 95 S.Ct. 1903 (quoting *United States v. Birnbaum,* 373 F.2d 250, 257 (2d Cir.), *cert. denied,* 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967)).

In this case, the trial record demonstrates that the evidence offered against Mercer was overwhelming and included testimony from the three victims, each who identified Mercer as her attacker and whose descriptions of Mercer and his vehicle were consistent with each other's, as well as that given by Mercer's former girlfriend. Nor does Mercer argue, and the record does not show, that Judge Hannigan gave any jury instruction that impermissibly shifted the burden of proof of guilt to Mercer and improperly explained Mercer's burden as to his insanity defense. Further, as discussed, Mercer's trial attorney, in order to effectively advance the insanity defense, conceded, in summation, Mercer had committed the acts of which he was accused, such that the only issue before the jury was Mercer's asserted insanity defense, on which Mercer had the burden of proof. As discussed, however, the proof Mercer presented on that defense was thin. *See* Discussion, *supra,* at 44, n. 22. In particular, two psychiatrists, Dr. Lynch and Dr. Joseph each testified that although Mercer exhibited some antisocial characteristics, he was not mentally ill at the time he committed the charged crimes and that Mercer could distinguish between right and wrong and realized that his actions were wrong. (T. 456–64: Dr. Lynch; T. 482–89: Dr. Joseph). Significantly, Mercer's own expert witness, Dr. Schutkeker, testified that there was "no question" that Mercer had committed the charged crimes, (T. 403), and that he knew they were "wrong." (T. 402).

On this record, the court finds that the reasonable doubt jury instruction, when viewed in light of the entire trial and jury charge did not mislead the jury into erroneously concluding Mercer's guilt. *Williams v. Cain, supra,* at 477 (upholding reasonable doubt instruction defining "reasonable doubt" as "moral certainty" as, based on the court's reading of *Cage* and *Victor,* the question of the petitioner's guilt or innocence "was not even remotely close" and, as such, petitioner had not "demonstrated a reasonable likelihood that the jury applied the instruction unconstitutionally"). Moreover, even assuming its retro-

active application, *Cage* does not require granting habeas relief as the reasonable doubt instruction given in Mercer's trial passes constitutional muster under the Supreme Court's more recent pronouncements on such definitions.

As noted, Judge Arcara re-referred this matter for further consideration in light of *Gaines v. Kelly,* in which the Second Circuit held that the definition of "reasonable doubt" contained in a similar jury instruction given in an unrelated case tried in 1982, violated due process based on *Cage.* Unlike the instant case, however, the habeas petition at issue in *Gaines* was filed in 1993, prior to the enactment of the AEDPA. Thus, the Second Circuit had no occasion to consider the merits of Gaines's petition under the new limitation on habeas relief enacted in § 2254(d). In other words, because Gaines's challenge to the reasonable doubt instruction was not subject to the AEDPA, the Second Circuit was not restricted to evaluating the claim only under "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). However, because Mercer filed his petition after the enactment of the AEDPA, it is subject to the AEDPA which obligates this court to rely only on "clearly established Federal law, as determined by the Supreme Court of the United States" in evaluation Mercer's challenge to the reasonable doubt instruction. Thus, even assuming *Cage, supra,* as well as subsequent cases further construing *Cage* apply retroactively, this court, by virtue of § 2254(d)(1), is not bound by the Second Circuit's decision in *Gaines, supra;* rather, this court may rely only on such subsequent cases decided by the Supreme Court, including *Sullivan, supra, Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), and *Victor, supra.* A careful reading of the relevant Supreme Court decisions demonstrates that Judge Hannigan's reasonable doubt instruction

did not lower the prosecution's burden of proof in violation of Mercer's constitutional right to due process.

In *Cage, supra,* the Supreme Court held that a definition of "reasonable doubt" as requiring a "grave uncertainty" and an "actual substantial doubt" suggested a higher degree of doubt than is required for acquittal under the accepted reasonable doubt standard, such that consideration of those statements with reference only to "moral certainty" rather than "evidentiary certainty" could reasonably have prompted a reasonable juror to convict on a lesser degree of proof than required by the Due Process Clause. *Cage, supra,* at 41, 111 S.Ct. 328; *see Victor, supra,* at 5, 114 S.Ct. 1239 ("In only one case [*Cage, supra* ] have we held that a definition of reasonable doubt violated the Due Process Clause."). The Court later held that a *Cage* violation could never be held harmless error and, thus, not amenable to harmless error review but, rather, required outright reversal. *Sullivan, supra,* at 280, 113 S.Ct. 2078.

However, in *Estelle v. McGuire,* 502 U.S. 62, 72 and n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the Supreme Court held that, for federal habeas review purposes, the proper inquiry when considering the constitutionality of a "reasonable doubt" definition contained in a jury charge is not whether such instruction "could have" been applied in an unconstitutional manner, but whether there is a "reasonable likelihood" that the jury did so apply it. Stated another way, the constitutional question presented on petition for federal habeas relief when a jury instruction contains a challenged definition of "reasonable doubt" is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* [24] standard." *Victor, supra,* at 6, 114 S.Ct. 1239.

---

**24.** Referring to *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)

(holding that the Due Process Clause protects the accused against conviction except upon

While not condoning the trial court's definition of "reasonable doubt" in its jury instructions, in *Victor*, the Court held that the Constitution neither prohibits nor requires such definition in any particular form. *Victor, supra*, at 16, 114 S.Ct. 1239. In *Victor*, the Supreme Court, in distinguishing *Cage* from the facts presented in *Victor*, emphasized that in *Cage*, it had objected to the use of the modifiers "grave" and "substantial" in defining the doubt required for acquittal because such words as " 'commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.' " *Victor, supra*, at 6, 114 S.Ct. 1239 (quoting *Cage, supra*, at 41, 111 S.Ct. 328). The Court reiterated that in *Cage*, it objected to the use of such statements, attempting to further define "beyond a reasonable doubt," by reference to a "moral certainty," rather than to an "evidentiary certainty," without further explanation of the phrase "moral certainty." *Victor, supra*, at 6 and 16, 114 S.Ct. 1239 (citing *Cage, supra*, at 41, 111 S.Ct. 328). Nevertheless, the Court upheld the use of the term "moral evidence" where the jury was instructed that it was their duty "to determine the facts of the case from the evidence received in the trial and not from any other source." *Victor, supra*, at 13, 114 S.Ct. 1239. Provided the phrase "moral certainty" was, according to the challenged instruction, to be grounded in the evidence at trial, any personal moralistic notions tending to dilute the reasonable degree of doubt based on evidentiary considerations needed to justify acquittal it might otherwise encourage were negated. *Id.*

In *Victor*, the Court further distinguished *Cage, supra*, on the basis that "[t]he moral certainty to which the *Cage* instruction referred was clearly related to the defendant's guilt; the problem in *Cage* was that the rest of the instruction provid-

ed insufficient context to lend meaning to the phrase." *Victor, supra*, at 21, 114 S.Ct. 1239. Accordingly, although in *Sullivan, supra*, the Court held that a *Cage* violation was not amenable to harmless error analysis but, rather, required reversal, under *Estelle* and *Victor*, for purposes of habeas review, a *Cage* violation does not occur whenever a jury instruction containing a definition of "reasonable doubt" that refers to a "moral certainty" is given.

As to the instant case, although the reasonable doubt instruction given in Mercer's trial is essentially identical to the one given in *Gaines, supra*, an analysis of that instruction in accordance with "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), demonstrates the reasonable doubt instruction is constitutional. Specifically, unlike the reasonable doubt charge in *Cage*, the instruction here did not define "reasonable doubt" to be "such doubt as would give rise to a grave uncertainty," or as "an actual substantial doubt." *Cage, supra*, at 40, 111 S.Ct. 328. Rather, the trial court, in attempting to define "reasonable doubt," instructed:

> A reasonable doubt is just what the words imply. A reasonable doubt is one that is based on reason, and *arising out of the whole evidence or lack of evidence in the case*. It's a doubt that leaves your mind in a state of suspense, so you're unable to say you're convinced to a moral certainty of a defendant's guilt. Reasonable doubt must be *based entirely*. and *absolutely upon some good, sound, substantial reason*, without appeal to prejudice, sympathy, or imagination. A juror who has a reasonable doubt and asserts it, ought to have a reason for that doubt that you can give to yourself and you should be able to give it to your fellow jurors if they request it. It's the duty of each juror to consider and discuss the opinions of the

proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.).

others. But you must decide the case *on your own honest opinion of the evidence,* your own judgment, and you're not required to surrender any conscious conviction you may entertain. *If after reviewing all the evidence in this case* you have a reasonable doubt as to the guilt of the defendant, it's your duty to acquit him of that crime. On the other hand, if a reasonable doubt has been dispelled and you are morally and reasonably certain of his guilt, it's just as much your duty to convict him *of the crime you may determine the evidence establishes.* There are two words in the definition, reasonable doubt, each has a value or it would not be there. It's not the duty of the People or the prosecution in a criminal case to establish the guilt of the defendant beyond all possible or imaginary doubt or to a mathematical certainty. That is not the burden the People have in this case because that degree of proof cannot be had in human affairs. If the People were held to that degree of proof it would be useless to try anyone in a criminal court. But it is possible to establish the guilt of the defendant charged with a crime to a reasonable degree of certainty. To that degree of proof, the People must be held. If they fail to sustain that burden, then the defendant is entitled to the benefit of a reasonable doubt and to acquittal.

(T. 574–76) (emphasis added).

A plain reading of this charge indicates that, unlike the charge at issue in *Cage,*

the doubt required for acquittal was not defined as either "grave" or "substantial." Nor was the phrase "moral certainty" used without reference to the evidence. Further, unlike the jury instructions at issue in *Cage,* the instruction cannot be interpreted as impressing on the jurors that the degree of certainty necessary to convict was grounded in any personal moralistic notions, which the Supreme Court has specifically disapproved. *Victor, supra,* at 16, 114 S.Ct. 1239. Rather, the instructions directed the jurors to consider the evidence at least four times: (T. 574—"A reasonable doubt is one that is based on reason, and arising out of the whole evidence or lack of evidence in the case."; T. 574—"Reasonable doubt must be based entirely and absolutely upon some good, sound, substantial reason, without appeal to prejudice, sympathy, or imagination."; T. 575—"If after reviewing all the evidence in this case you have a reasonable doubt as to the guilt of the defendant, it's your duty to acquit him of that crime. On the other hand, if a reasonable doubt has been dispelled and you are morally and reasonably certain of his guilt, it's just as much your duty to convict him of the crime you may determine the evidence establishes."). As noted, jury instructions directing that any reasonable doubt determination must be grounded in the evidence, rather than in moralistic notions not grounded in the record have been upheld by the Supreme Court. *Victor, supra,* at 16, 114 S.Ct. 1239.[25]

**25.** In *Gaines, supra,* the Second Circuit predicated its reversal of the denial of petitioner's request for habeas relief in part on its determination that

the appellate court in New York State reviewing these instructions reversed no fewer than 21 convictions because of these instructions that were given by the same trial judge [Judge Hannigan] with frequent citation to the Supreme Court's decisions in *Cage,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339, ... and *Sullivan [v. Louisiana ],* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182.... The state appellate court reversals were based primarily on the trial

court's definition of reasonable doubt as "morally and reasonably certain.... The state appellate court believed that such a charge effectively reduced the People's burden of proof necessary to convict and thereby deprive petitioner of a fair trial. Such remarkable consistency and frequency in the state court's decision to reverse based on the same instructions, given by the same judge, we think supports our conclusion that the errors involved in Gaines's trial are not simply technical failing, but errors of a constitutional dimension."

*Gaines, supra,* at 606–07.

Excluding the testimony by the psychiatrists which, under New York law is to be considered only with regard to Mercer's asserted insanity defense, the evidence at trial and to which Judge Hannigan had repeatedly referred the jury, included testimony by all three victims who positively identified Mercer as the perpetrator, similarly described the interior of Mercer's vehicle, and who testified that they did not willfully accompany Mercer, but, rather, that he had forced them into his car and forcefully sodomized, raped and attempted to rape them. Testimony was also presented by various family members of the victims, the law enforcement officers involved in the investigation and arrest of Mercer, including Niagara Falls Police Detective Brooks who testified that Mercer had admitted some involvement with each of the victims (T. 274–300), nurses and other health care professionals who examined the victims following their assaults, Mercer's previous girlfriend whose description of the interior of Mercer's vehicle and Mercer's tattoos were consistent with the descriptions given by the three victims (T. 314–16), and two forensic laboratory specialists, one of whom testified that hair fibers recovered from Mercer's vehicle could have been from one of the victims. (T. 364). Also admitted into evidence were articles of clothing and personal belongings of the victims, and items which the victims had testified they saw inside Mercer's vehicle, including ointment, a broken screwdriver, a pair of fuzzy dice, packs of cigarettes, cassette tapes, and a decal with the name "Jimmy," and which were recovered from Mercer's vehicle and residence.

The court finds that, in accordance with "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), as applicable to Mercer's conviction, Judge Hannigan's reasonable doubt instruction, which extensively directed the jury consider the overwhelming evidence of Mercer's guilt, taken as a whole and in relation to the evidence in the record, negates any basis for finding a "reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard [requiring that the accused be convicted only upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged]," *Victor, supra,* at 6, 114 S.Ct. 1239. Such finding is particularly supported where, as here, defense counsel conceded Mercer's guilt as to the charged crimes in order to more effectively argue, albeit unsuccessfully, Mercer's legal innocence by reason of insanity, a defense as to which Mercer, not the prosecution, carried the burden of proof.

Whether evaluated under the standard enunciated in *Victor,* or even in *Cage,* Mercer's attack on the reasonable doubt instruction in this case amounts to a post trial "second guess" of the only defense strategy available to Mercer at the time of his trial. Simply put, Mercer seeks habeas relief based on asserted defects in the reasonable doubt portion of the jury instructions, an issue that had little or nothing to do with the outcome of his trial. Accordingly, Mercer's claim that the challenged reasonable doubt instruction violated his due process rights is without merit.

That the Second Circuit in *Gaines* did not discuss the reasonable doubt jury instruction in the context of the entire jury charge and trial, as required, *Criswell, supra, Park, supra,* should not prevent this court from doing so in accordance with the mandate of 28 U.S.C. § 2254(d)(1), an issue not involved in *Gaines.* The court further notes that as recently as 1996, the Second Circuit, in the context of a federal habeas petition seeking to set aside a state court conviction, considered the phrase

"beyond a reasonable doubt" to be "synonymous" with the phrase "to a moral certainty." *Maldonado v. Scully,* 86 F.3d 32, 34 n. 5 (2d Cir.1996). Additionally, in reviewing precedents in the Appellate Division, Fourth Department, the *Gaines* opinion cites no decision of the Appellate Division, prior to 1991, holding the beyond a reasonable doubt instruction similar to the one at issue to be unconstitutional. *Gaines, supra,* at 606, n. 2. Mercer's conviction became final in 1989.

## CONCLUSION

Based on the foregoing, Mercer's petition should be DISMISSED. Further, as the court finds there is no substantial question presented for appellate review, a certificate of appealability should not issue. 28 U.S.C. § 2253, as amended by the Antiterrorism and Effective Death Penalty Act of 1996.